My name is Nina Wilder, and I represent Defendant Appellant Cody Dobbs. I would ask at this point to reserve two minutes for rebuttal. And I begin my argument with the proposition that in a variety of ways this was, and notwithstanding Federal law, a medical marijuana case. The enactment of California medical marijuana laws influenced this case in many ways, which directly impact on the, at least two of the issues in this appeal, the limitation of the direct examination of the defense expert, Christopher Conrad, and the Brady-Jenks issue, and I will explain that. The other thing I would say is that as far as you know, I can ask your opponent this, but as far as you know, there's been no change in the prosecutorial posture of this case because of the recent announcement concerning Federal prosecution of medical marijuana cases. I have not received any notification of a change. All right. I don't believe there has been. All right. I can ask the other side. In any case, going back to my point, in a very narrow sense, this was a medical marijuana case, and the trial judge selectively allowed in testimony regarding medical marijuana, various of the witnesses, including Thomas Golden and other witnesses, talked about their own use of medical marijuana. In addition, medical marijuana certificates were admitted, so there was selective admission until you get to Christopher Conrad, the expert, and at that end there was selective admission of direct testimony regarding medical marijuana. Then you get to Christopher Conrad, the defense expert, and he is not permitted to testify to the configuration of the marijuana plants at the Prairie Creek Grow on a theory that somehow this will trigger the jury's association with medical marijuana, whereas in fact it was entirely relevant to the issue of personal possession versus possession for distribution. Medical marijuana also, and the enactment of the medical marijuana laws, also impacted this case in a very, in a much larger sense, and thereby impacted both the defense to this case and the Brady-Jenks issue. And in... I must, I guess in my reaction to reading the papers and everything was that although there was mention of medical marijuana by one user who was a tenant in the house, the rest of the operation didn't, well, there's one other thing, that was the Humboldt County authorities, I guess, saying it didn't amount to it. But otherwise, it sounded just like a great big production of marijuana. I don't know. Well, let me step back, because the enactment affected law enforcement. This is several steps. It's not simply that there was testimony. The enactment of the medical marijuana laws directly affected the investigation and prosecution of marijuana cases, which moved to Federal investigation and the Federal courts predominantly. And that led to, or is the basis for, prong one of Mr. Dobbs' defense, which was that there was, as his attorney said, whether one credits it or not, a Federal war on marijuana in California. But that doesn't explain why Mr. Cody would be targeted in that way. But that also doesn't equate to any reversible error. The fact that there's a policy decision that moves certain prosecutions to the Federal side, there they are. So how is that reversible error? Well, that brings me to the second way it impacted the investigation. And that is, it actually was responsible for a much closer collaboration between local law enforcement agencies and Federal agencies, and it's in this case a referral from a local law enforcement officer, Commander Prose, to the DEA. And the reason this is relevant is, one, it is part of Mr. Dobbs' defense, but, two, it directly impacts the Brady-Jenks issue, because it impacts the — the Brady-Jenks issue presents a question as to the scope of a prosecutor's, a Federal prosecutor's obligation to obtain exculpatory evidence from local law enforcement officers. Now, it is clear under Kyle v. Whitley that if it were a State prosecutor and State investigators, the full Kyle v. Whitley obligation would apply. That is, the Federal prosecutor would be responsible for any evidence, any exculpatory evidence in the hands of the Federal investigators who brought — who brought that case. It is also clear, because Kyle v. Whitley is a State case, that a State prosecutor is responsible under Brady for any evidence, exculpatory evidence, be it impeachment or factually exculpatory, that is in the hands of the State investigating agents. The question raised here is, what is the responsibility of the Federal prosecutor under Kyle v. Whitley? Well, isn't really the narrower question for us whether the district court abused its discretion in determining that sanctions were not warranted as distinct from granting additional opportunities for cross-examination and other ways of handling the problem? Isn't that really the narrow issue that we have to decide? Well, I do think that to look at the narrow issue, you need to look at the broader issue, which is — Isn't that what — what we're looking at is, what did the district court do that maybe it shouldn't have done? That's kind of how we do business. So it's — what I understood your papers to be quarreling with was the decision not to impose a greater sanction or benefit to the defendant other than this extra opportunity for cross-examination and so forth. Is that the district court's decision that you're relying on? But part of that reasoning, a large part of it, had to do with how the district court interpreted the prosecutor's obligation. You may recall Judge Ilsen solicited a declaration from the Federal prosecutor tilted toward the issue of whether or not there had been bad faith or good faith, which is really a Jenks act, a Jenks question. The district court did not examine, and based on that, the court found that no sanctions would be appropriate, rather — and simply this additional opportunity to examine would be appropriate. What the court did not look at was what was the prosecutor's separate Brady obligation which falls on the prosecution irrespective of intent. The prosecutor does not have to have any malign intent. Under Kyle v. Whitley, even an innocent failure to obtain exculpatory information from an agent for whom you have some responsibility, who has some responsibility to the investigation, is a violation of Brady. So this was treated essentially as a Jenks violation, and the court did not really look at it as a Brady violation, which would have resulted, I think, in a quite different result. And that difference in analysis is what underlies what we would submit was the ultimate abuse of discretion in denying broader sanctions, so that in this case, what we would intend is that the prosecution, the Federal prosecutor, because of Ron Crowe's involvement in the case and because the tape recording that was at issue was, one, exculpatory, and two, was made in the presence of a Federal agent, DEA agent, that the prosecutor had a Kyle v. Whitley obligation to inquire of Ron Crowe's whether in fact he had exculpatory evidence, that his knowledge of the tape would be imputed to the DEA agent in any event, and that the failure to do so is a Brady violation calling for Brady-type sanctions, and in this case, the more extreme sanctions rather than the milder relief that was offered, which was to recall one of the witnesses. Over defense counsel's assertion that that was not adequate, and it may well be that as a Jenks sanction, it would have been adequate, but as a Brady sanction, it was not. Kennedy. Was Brady raised in the district court or was it just complained that it was a Jenks act violation? Ginsburg. It was raised in the district court as well. It was in the papers. But the way it was decided turned out to be based more on Jenks' standards. And again, under Jenks, the good faith, bad faith of the prosecutor is key. Under Brady and Kyle v. Whitley, it's not relevant. Getting then to the further point, which is that this evidence was manifestly exculpatory, and it went not only to a single witness, as the prosecution would argue, and as I think Judge Ilston assumed, it went directly to the heart of the defense, which was, and this is part two of why one needs to step back, that there was some collusion, in effect, between local law enforcement, here in the and the locals, the, you know, second, third generation of marijuana growers who reside in those counties, and that the point ultimately would have been not simply that Shields is not to be credited, Eddie Shields, but that he was protected and that Mr. Dobbs was targeted by Ron Prose and local law enforcement, and that there was an  And that could not have been extracted simply by recalling Mr. Shields and asking him about the precise statements in the recording. I would turn, unless the Court has questions about that, I would turn then to the suppression issue, and particularly the curtilage issue. What do you contend comprised the curtilage? The area that was, that essentially shielded the house from view. This is a rural area, and our contention is that a natural, you don't need a fence to create a natural barrier. No, no, I understand. I understand the theory, but just physically, there's, there were several different iterations of it, so was it more than the clearing? Was it less than the clearing, or was it equal to the clearing that surrounded the house? It was essentially the clearing, but down to the gates that initially signaled that this was private property that should not be. That's two different things. Right. Because there's, the clearing is one thing, and the driveway leads out of it where the gates are. Those are not, that's why I was in part asking the question, because if it's just the clearing, the officers didn't enter the clearing. So even if you're right that that was all curtilage, they stayed outside the clearing, looked whatever they could see through the trees from outside that clearing. But I guess what our contention is, is that those trees themselves are a boundary. The gates and the trees form a boundary, and the officers in trust, in walking beyond the gates and into the trees, trespassed a boundary, and trespass is obviously not the concept, but violated obvious privacy interests on which they were of notice. There were other users of this road. I gather they were all tenants of the defendant. Correct. Correct. And so that you have a more extended zone of privacy since they're included in it, but in that they're tenants, he would have standing to assert the privacy interests for that entire property. Well, I'm just sort of getting at how many people use this road and how private it really is, I guess. There is no evidence that anyone other than these people use that road. The evidence is that this was a secluded area and was deliberately a secluded area, as are many of these rural areas. I think the standard, and the case law clearly says that, the standard for curtilage that apply in urban and suburban areas clearly do not apply in rural areas. It's also clear equally, though, that just because you own a ton of rural property, it doesn't all become the curtilage. So if you own a 40,000-acre ranch, you don't have 40,000 acres of curtilage. So we still have some. The fact that it's rural and it's big kind of doesn't quite answer the question, it seems to me. Well, no one is asserting that all 80 acres of property were within the curtilage, but those acres did act as a visual barrier as well as a physical barrier to entry. And in that regard, crossing that barrier constituted an invasion of curtilage. So crossing the gate in the first instance, which is notice this is a private road. Then going further into the tree line, no one would expect any passerby, and the standard is the passerby standard in Dunn. No one would expect a passerby, and I doubt very much that at any time any passersby, went beyond the gate and continued up the road into the tree line that was directly adjacent to the clearing area. No one would do that. There were no passersby, and again, that's the Dunn standard. Would some casual passerby wander into this area, or could the person who lived here in that area assume that their activities within that cleared area and beyond, and somewhat beyond, were private? And that's really the issue here, the zone of privacy, because, again, it's not a physical standard. It's a privacy standard. And Mr. Dobbs had every reason to believe that the way the gates were set up and the way the trees were aligned, that no passerby would come onto his property or even anywhere adjacent to his property where his private activities on that property could be seen, and that's the issue here. If the Court has no questions. Thank you. Okay. Please, the Court. My name is Kirsten Ault, and I represent the United States in this case. First, to answer the Court's question, this was not a medical marijuana case. There was no evidence that Mr. Dobbs was growing marijuana for medical purposes. In fact, this was a commercial operation by which Mr. Dobbs made hundreds of thousands of dollars that the evidence at trial showed he invested mostly in a mortgage fraud scheme and then gambled away in Las Vegas and casinos in northern Humboldt County. Well, I accept the statement that it's not, there's no evidence it was medical marijuana, but I suppose if there is a true medical marijuana industry, some of it could be commercial. I disagree with that, Your Honor. In fact, I think California's medical marijuana law was specifically set up so that you cannot grow marijuana for commercial purposes. In fact — But, I mean, all of our health care system seems to be commercial, so I'm not so sure that a legitimate medical marijuana program could not involve commercial production. Be that as it may, that's not the way the California law is written. The way the California law is written, a person may grow marijuana for their own use, or if they are a caretaker for someone else, they may grow marijuana for that person. But the commercial sale of marijuana is still prohibited even under California law. Okay. However, that is irrelevant to this case because it's certainly growing it for any purpose is prohibited under Federal law. And the district court was correct to exclude all evidence, including the defendant's proffered expert testimony, that went to the issue of whether or not this was a medical marijuana grow. Okay. In addition, this case against Mr. Dobbs did, in fact, start as a State investigation of Mr. Dobbs for violating State marijuana laws, which would indicate that the State also believed that what Mr. Dobbs was doing was not legal under State law. Turning to the issue of the Brady-Jenks Act disclosures, there was no Brady or Jenks Act violation in this case, but even if there were, the district court fashioned an appropriate remedy that gave the defendant exactly what he asked for. The district court gave the defendant the opportunity to cross-examine Eddie Shields and Ron Prose, if he so choose, with the tape recording. Two questions. There was some question, excuse me, raised earlier by Judge Canby as to whether a Brady argument was made in the district court as well as a Jenks Act argument. I do believe that both arguments were raised in the district court and that the district court's decision covered them both. In fact, the district court's decision relied on this Court's decision in the United States v. Dupuy, I believe that's how you pronounce it, which addressed both Jenks and Brady claims. And the district court found that under Dupuy the standard is that striking testimony is only appropriate where the defendant was prejudiced by an untimely disclosure. And in this case, the disclosure, it's not that no disclosure was made. The disclosure was made during trial as opposed to before trial. And that there was a willful avoidance and egregious dereliction of the prosecutor's duty. And the district court found that neither of those occurred, and those findings were not erroneous. The other question that I have is also about the record, and that is whether you said that the defendant was given what he asked for. Was there any further request for sanctions beyond the additional cross-examination opportunity? The defendant did request that Mr. Shields' testimony be stricken. He did not request that Mr. Prose's testimony be stricken, only Mr. Shields'. The district court found that that was not an appropriate sanction in this case for the reasons that I stated. And the district court's factual findings that there was no prejudice and that there was no egregious dereliction of the prosecutorial's duties, those findings are not clearly erroneous. There was no prejudice in this case, and the fact that shows that most clearly is the jury's verdict. Mr. Shields' testimony went primarily to count two, which is the count that charged the Miranda Grow site. His testimony on all other issues was cumulative to many other witnesses, and the jury didn't reach a verdict on count two, which fairly clearly shows that they did not believe Mr. Shields, which indicates that the defendant's cross-examination of Mr. Shields was quite effective. So the defendant simply suffered no prejudice in this case. In addition, there was no avoidance of the prosecutor's duty in this case because we did not know that the tape existed. And as soon as we found out that the tape existed, even though it was in the possession of a retired State officer, so we had no obligation to produce it, we went to extreme measures to obtain the tape, put it in a form that the defense counsel could use, and get it to the defense counsel before the end of trial. And we – the district court kept both Mr. Shields and Mr. Prose on call to be recalled by the defense counsel if he wanted to continue to cross-examine them, and we agreed to assist in making them available to the defense counsel if they should need them for additional testimony. So in this case, there simply was no error, and if there was error, the district court acted appropriately in fashioning a remedy, which the defendant declined to take advantage of. On the issue of the curtilage, in this case, the agents were standing where they had a when they saw and smelled potted marijuana plants growing alongside the road. Kennedy, I wasn't too clear on whether there is a barrier across that road when you enter. Your Honor, there is a public road, which is Crooked Prairie Road. And between Crooked Prairie Road and the private road that leads up to the defendant's house, there's a gate, and the gate was locked. However, there is no fence extending from the gate. And as is common in rural areas, there's indentations on either side of the gate that indicated that it was frequently walked around. Hikers sometimes will do that when they encounter a locked gate and they want to continue up a path, they will walk around the gate. So the only locked barrier between the public road and Mr. Dobbs' house was this gate that didn't have a fence attached to it. Were there some more fences in between? That was a matter that was disputed below. The agents did not run across, when they were walking up the private road, they did not run across any additional fences. Defense counsel, trial counsel, submitted a declaration on information and belief that there was a chain strung across one of the roads. The district court below rejected defense counsel's information and belief declaration as not competent evidence. Regardless, there were two, the private road, there was eventually a Y that was reached. And the agents went up the left side of the Y. The right side of the Y is the Y that supposedly had a chain stretched across it. So the path that the agents took had no further barriers between them and the point that they reached. However, the point that they reached was nowhere near the curtilage, because they were outside of the clearing surrounding the house. There were trees separating them and the clearing. And the marijuana plants that they saw were also outside of the clearing. So not only were they not in the clearing, the objects that they were observing were not in the clearing. The fact that there was a house 75 yards away is simply not relevant to the court's analysis in this case, because the agents were not there. Some of the plants were on pots adjacent to the house, weren't they? They were, but those were not the plants that the agents saw that day before they executed the search warrant. So the plants that they saw that day were not the plants next to the house. Plants that they saw were plants that were next to the road. The plants were in pots and they were scattered all over the defendant's property. So the agents actually saw marijuana plants on either side of the road within 10 to 15 feet of where they were standing. And those plants were not within the curtilage either. And based on seeing the marijuana plants and spelling them, that gave them sufficient probable cause to get a search warrant with the magistrate appropriately authorized, and the district court was correct in not suppressing the evidence. If there are no further questions of the court. I don't believe so. Then I will submit. Thank you, Your Honor. You may do that. Ms. Wilder, you still have some time remaining, though. And I would like to begin by clarifying that medical marijuana was not a defense in this case. However, it impacted the issues in this case, and most directly the Christopher Conrad issue, where the intent in presenting his testimony about the arraying of the plants or the arrangement of the plants was to show that these were three persons who were growing plants for personal use. It didn't matter whether it was marijuana or not. The statute charged, 21 U.S.C. section 846, requires that there be an intent to distribute. Not necessarily an intent to sell, but an intent to distribute. An intent to use the plants personally, even if you're growing them jointly, would not be a violation of 21 U.S.C. section 846. I would also turn to then the Brady issue. And I would begin by saying that, and I would cite the court to excerpt of record page 146, the court will see that the remedy requested was the striking of both Shields and Ron Prose's testimony. So say — and Ron — by that point, Ron Prose had been excused. And so saying we're going to call back Shields did not address the entire issue. Moreover, and this will actually go to the heart of the argument, this case is governed not by Dupree, but as made clear in this Court's recent decision in United States v. Price, which is cited in our reply brief. It's a very recent decision. The obligation here was under Kiles v. Whitley. There does not have to be bad faith under Brady. Mere neglect, inadvertence. If there was an obligation triggered in this case for the government to obtain Brady information from Ron Prose, and we say there was because of the degree to which he was involved in the case, he was the source of the referral to the DEA, and the interview that was withheld or lost or whatever, that was done in the presence of a Federal agent, a DEA agent. He was party to it, and you have to then impute Commander Rose's knowledge to that agent. But this is not a Dupree case. We've gone far beyond that. This is a Kiles v. Whitley case where the failure to get that evidence, present that evidence in itself is a Brady violation. Moreover, and as a matter of timing, what Brady teaches is that, unlike Jenks where there's a timeline in the statute, Brady commands that there be disclosure when the evidence is valuable to the defense. And under Brady, that's determined by the defense. And when defense counsel said this is an inadequate remedy because my theory of defense is broader than just bare butts, my theory of defense is broader because I am arguing that Shields is being protected by Ron Rose and these other local agents at my expense. That was the theory of defense, and merely recalling Shields and asking about the tape would not have been sufficient. It had to be part of this larger challenge to Shields and to Prose. Thank you, Counsel. Thank you. We appreciate the arguments. Thank you. And the case just argued is submitted. That will bring us to the end of this morning's docket.
judges: Fletcher B. , Canby, Graber